**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANDRE ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-2023 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| OFFICE OF THE COOK COUNTY | ) | |
| RECORDER OF DEEDS, and THE | ) | |
| COUNTY OF COOK, as indemnitor, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Andre Robinson worked at the Cook County Recorder of Deeds ("CCRD") for more than twenty years. He suffered from dyslexia and poor vision, which made it difficult to do parts of his job involving reading and writing. According to Robinson, he told CCRD about his conditions and requested various accommodations. CCRD responded by making some accommodations, but they did not do everything that Robinson requested. In the end, Robinson found his job so stressful that he retired earlier than he wanted.

Robinson ultimately sued his former employer under the Americans with Disabilities Act ("ADA"). The complaint recounts a long series of problems that Robinson encountered over the past two decades.

CCRD has moved to dismiss on two grounds. First, CCRD argues that some of the complaint alleges conduct that falls outside the statute of limitations. Second, CCRD contends that the allegations about the remaining conduct fail to state a plausible claim under the ADA.

The motion is granted in part and denied in part.

**Background**

Plaintiff Andre Robinson worked at the Cook County Recorder of Deeds for more than two decades, from 1996 to 2018.[1] *See* Am. Cplt., at ¶¶ 8, 50 (Dckt. No. 7). Robinson started as a Check Cashier in a satellite office in the Markham Courthouse. *Id*. at ¶ 8. Two years later, he was promoted to a Supervisor Assistant. *Id*. at ¶ 9. In 2005 or 2006, he was promoted to Satellite Supervisor, overseeing the Markham office. *Id*. at ¶ 14. He remained in that role until 2018, when he allegedly was forced to retire early due to his disabilities. *Id*. at ¶ 50.

During that time, Robinson suffered from two disabilities – dyslexia[2] and poor vision[3] – that made it difficult for him to perform the parts of his job that involved reading and writing. *Id*. at ¶¶ 62, 63. He was formally diagnosed with dyslexia sometime in the 1990s. *Id*. at ¶ 63; Exhibits to Am. Cplt., at 13 (Dckt. No. 9).[4] He had issues with his vision as early as 1998, and

---

[1] Since Robinson left CCRD, CCRD has been subsumed into the Clerk's Office. *See* Cook County Vital Records Moving to County Building in Chicago, Daily Herald, November 23, 2020, archived at https://perma.cc/X6DW-7SJT. When CCRD was an independent office, it was responsible for "recording, archiving and retrieving all documents submitted by the public to be recorded, the most prominent being mortgages, deeds and liens." *See* County Recorder, Fact Sheet Series Vol. 1, No. 7 of 14, Illinois Association of County Board Members and Commissioners, archived at https://perma.cc/ASJ5-3HLD.

[2] Dyslexia is "a learning disorder that involves difficulty reading due to problems identifying speech sounds and learning how they relate to letters and words (decoding)." *See* Dyslexia, The Mayo Clinic, archived at https://perma.cc/HE5W-HNEL. People who suffer from dyslexia frequently have symptoms including "[d]ifficulty reading, including reading aloud," "[s]pending an unusually long time completing tasks that involve reading or writing," and "[p]roblems spelling." *Id*.

[3] Robinson suffers from four diagnosed eye conditions: (1) "presbyopia" ("the gradual loss of your eyes' ability to focus on nearby objects . . . a natural, often annoying part of aging"); (2) hyperopia ("farsightedness"); (3) "amblyopia" in his right eye, which gives him monocular vision ("Amblyopia (also called lazy eye) is a type of poor vision that happens in just 1 eye") (monocular vision "refers to having no vision in one eye with adequate vision in the other"); and (4) nuclear cataracts in his right eye ("clouding of the normally clear lens of your eye . . . like looking through a frosty or fogged-up window."). *See* Exhibits to Am. Cplt., at 50–51 (Dckt. No. 9); *see also* Presbyopia, Mayo Clinic, archived at https://perma.cc/8C94-4ZCG; Farsightedness, Mayo Clinic, archived at https://perma.cc/QD45-66BU; Lazy eye (Amblyopia), Mayo Clinic, archived at https://perma.cc/HEH5-QKR4; Cataracts, Mayo Clinic, archived at https://perma.cc/DL64-BKK2.

[4] The Court can consider exhibits to a complaint when deciding a motion to dismiss. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

he was diagnosed with four different eye conditions no later than 2016.[5]  *See* Am. Cplt., at ¶¶ 12,
62 (Dckt. No. 7); Exhibits to Am. Cplt., at 50–51 (Dckt. No. 9).

The complaint describes a wide variety of incidents that took place at CCRD over the
span of twenty years.  The complaint covers a lot of terrain – two decades – and it is not always
easy to figure out what Robinson believes is actionable.  Three challenges jump out.

First, some of the allegations seem to describe general difficulties at work, above and
beyond allegations about problems tied to his disabilities.  An example is paragraph 28, which
alleges that Robinson's boss "overreacted" to Robinson's statement that a room was clean and
not too warm.  *See* Am. Cplt., at ¶ 28 (Dckt. No. 7).  It is not always clear how some of the work
problems – meaning problems separate and apart from his disability – could support a disability
claim.  Maybe Robinson included them as general context.

Second, at other times, the complaint alleges problems that might or might not be related
to his disability.  A good example is paragraph 29, which alleges a "misunderstanding" about
which cashier was going to a satellite office.  *Id.* at ¶ 29.  Maybe that misunderstanding was
related to dyslexia, or maybe it was the type of run-of-the-mill misunderstanding that happens to
everyone in daily life.

Third, for some of the disability-related allegations, it is not always easy to figure out if
Robinson included them as background, or if Robinson included them because he thinks that
something actionable took place.  That is, it is sometimes difficult to discern which incidents (in
Robinson's view) amounted to discrimination based on his disabilities, and which incidents are

---

[5]  In his complaint, Robinson notes that he experienced a number of other health issues during his time at
CCRD, but he does not allege that any of those issues rose to the level of a disability, or that CCRD
discriminated against him on the basis of those other issues.  Those other health issues include problems
sleeping, raised blood pressure, fluctuating AIC1 levels, impacted mood, irritable bowel syndrome, and a
hemorrhage in his left eye.  *See* Am. Cplt., at ¶¶ 18, 37, 38 (Dckt. No. 7).  He also alleges that he had
shoulder surgery in 2013, 2014, 2015, and 2016.  *See id.* at ¶ 27.

there for color and context. For example, the complaint includes several paragraphs about providing his medical records to CCRD. *See, e.g., id*. at ¶¶ 16, 34, 38, 40, 42, 54. Maybe Robinson included those paragraphs to show that his employer was on notice about his disability. Or maybe Robinson intended to allege that CCRD knew about a problem, but didn't do much about it.

That difficulty is especially noticeable for the older conduct. Perhaps Robinson included some of the old conduct simply to show CCRD's knowledge of his disability. The section of the complaint that recounts the claim provides no clarity – it lists one count for "Violation of the ADA." *Id*. at Count I.

It matters because it affects the analysis for the statute of limitations. If an incident provides background, but does not give rise to a claim per se, then the statute of limitations does not matter. But if Robinson is alleging that the old conduct provides a basis for liability, then it does matter when the claim accrued and whether the claim was timely.

The Court reads the complaint broadly in Robinson's favor, and assumes that Robinson is alleging that all of the conduct described in the complaint gives rise to a claim. In an effort to structure the analysis, the Court will break the allegations into seven separate incidents (for lack of a better word) between 2003 and 2018. Some of the incidents took place before February 14, 2018 (the key date for the statute of limitations), and others did not. Separating the incidents will help evaluate whether any of them are too old to give rise to a claim.

### Incident #1: CCRD Learns About Robinson's Vision Issues and Makes an Initial Accommodation (2003 or 2004)

CCRD first learned about Robinson's vision issues "in early 2003 or 2004." *See* Am. Cplt., at ¶ 12 (Dckt. No. 7). At that point, Robinson was working as a Supervisor's Assistant, and was having "vision problems in reading computer screens as well as documents." *Id*. at ¶¶ 9,

12.  His problems were "reported" (it is unclear by whom) to the head of the CCRD satellite offices.  *Id*. at ¶ 12.  In response, "[s]omeone from tech support came to the Markham location at this time with the intention to improve the screen for Plaintiff."  *Id*.

It is unclear if anyone ever improved the screen, or simply had the "intention of trying to improve the screen."  *Id*.  Either way, it was a one-time visit.  "[T]hey never came back and nothing further in this regard occurred."  *Id*.  The complaint does not divulge what happened next.

Based on the words "intention" and "nothing," the Court reads the complaint generously in Robinson's favor to allege that he did not receive a better computer screen.

### Incident #2:  CCRD Learns About Robinson's Dyslexia and Makes an Initial Accommodation (2013 to 2014)

The complaint then fast forwards a decade.  CCRD first learned that Robinson had a learning disability of some kind in 2014 when he told his supervisor, Linda Tyson.  *Id*. at ¶ 23.

Tyson came by Robinson's office to help him draft a report.  She asked him to transcribe words and numbers as she read them out loud.  *Id*. at ¶¶ 23, 24.  Robinson struggled to take dictation due to his dyslexia, and he told Tyson that he had a "learning disability."  *Id*. at ¶ 23.  It's not clear if he told her that he had dyslexia specifically.  *Id*.  In response, Tyson told Robinson to write down only numbers as she dictated them, and she completed the other portions of the report herself.  *Id*.

The complaint does not appear to allege that this incident is an example of discrimination.  Robinson told Tyson about his disability, and she responded by telling him that he did not have to write down letters.  The complaint does not allege, or even imply, that Tyson should have done more at that point.

Sometime later, Tyson began to "assist Plaintiff on E-Mail, E-Recording, and, [sic] other reading and/or technological issues."[6] *Id.* at ¶ 71. The complaint doesn't specify exactly when Tyson began to provide that kind of assistance.

Two documents attached to the complaint provide clues, but they don't provide much help in pinning down exact dates. Years later, on October 3, 2017, Tyson sent a letter stating that she had exempted Robinson from e-recordings in 2015, after Robison told her about his troubles. *See* Exhibits to Am. Cplt., at 21–22 (Dckt. No. 9). On November 15, 2018, Pat Fallon (the head of Human Resources) sent an email noting that Robinson had received accommodations related to e-recordings for "quite some time." *Id.* at 46.

Putting the timing aside, the complaint does allege that Tyson "assist[ed]" Robinson with email and e-recordings. *See* Am. Cplt., at ¶ 71 (Dckt. No. 7). It's not clear from the complaint whether Robinson ever felt that Tyson's help during this time (2013 to 2014) was a sufficient accommodation.

### Incident #3: Robinson Sends a 2013 Report from His Neuropsychologist to Human Resources (2015 or 2016)

Sometime in "either 2015 or 2016," Robinson sent Human Resources a copy of a report authored by his neuropsychologist, Dr. Frank Mordini. *See* Am. Cplt., at ¶ 16 (Dckt. No. 7). That report, dated 2013, stated that Robinson had dyslexia and that "[i]n terms of his job duties, Mr. Robinson may benefit from being given increased time to complete tasks which involve significant writing, reading and spelling." *See* Exhibits to Am. Cplt., at 18 (Dckt. No. 9).

---

[6] Robinson's allegation on this point is in tension with what he alleged in the Charge of Discrimination filed with the EEOC. In the Charge of Discrimination, Robinson stated that "[t]here has been *no* substantive accommodations made to my working conditions," other than one instance when Tyson assisted him in 2018. *See* Exhibits to Am. Cplt., at 3 (Dckt. No. 9) (emphasis in original). Yet here, in his Complaint, he states that Tyson began assisting him in 2014. *See* Am. Cplt., at ¶¶ 23–24, 71.

The complaint does not develop this part of the story. The complaint does not explain whether Human Resources ever responded. And the complaint does not divulge whether Robinson ever received the "increased time to complete tasks" recommended by his doctor. *Id.* So, the complaint alleges that Robinson's doctor recommended extra time in "2015 or 2016," but the rest of that part of the story is untold. *See* Am. Cplt., at ¶ 16 (Dckt. No. 7).

### Incident #4: Robinson's Relationship with Tyson Begins to Sour and the Quality of the Accommodation Deteriorates (2017)

In the summer of 2017, Robinson's relationship with Tyson (again, his boss) soured. The complaint seems to allege that Tyson began to help Robinson less. And it suggests that the two of them had three altercations, culminating in Robinson filing a grievance with Human Resources.

The complaint alleges that sometime around the summer of 2017, Tyson began to help Robinson less frequently than she had in the past. So, the problem seemed to be *how often* he received the accommodations, not *what* they were.

Specifically, he alleges that Tyson was "frequently not available to provide such assistance," and that she had "limited time to assist , [sic] let alone correct, every E-Recording or other E-Mail [sic] and/ot [sic] writing or technological issue that Plaintiff had difficulty with." *See id.* at ¶¶ 71, 72. He also alleges that Tyson seemed "frustrated" at having to assist him and that, on at least one occasion, she flatly refused to help him with any issues involving e-recordings, something that she had promised to do. *Id.* at ¶ 71.

Again, the complaint is fuzzy about the timing. It is unclear when Tyson was "frequently not available." *See id.* As support, the complaint cites a collection of emails from 2017. *Id.* So the alleged problems with Tyson's unavailability took place in that time frame. Maybe Tyson was unavailable earlier than that, or later, too. But if so, the complaint does not say so.

During that same period, the summer of 2017, Robinson and Tyson got into three disagreements. First, in June 2017, Tyson emailed Robinson letting him know that she would be meeting with a visitor at his office the next day. *See* Am. Cplt., at ¶ 28; Exhibits to Am. Cplt., at 69–73 (Dckt. No. 9). She asked several questions about the condition of the office. *Id*. Robinson replied "Ok." *See* Exhibits to Am. Cplt., at 69–73 (Dckt. No. 9). Robinson's one-word response led Tyson to send a series of increasingly confrontational emails.

The emails culminated in a message from Tyson stating she was concerned that Robinson "may be starting to experience problems being able to see the computer screen again," that Robinson's failure to respond to her emails in a satisfactory manner had "caus[ed] great frustration," and that issues of this sort were happening "much more frequently than you realize." *Id*. at 70. She also mentioned that she knew one of Robinson's co-workers "yells at you now," and speculated that it might be "out of frustration when you two have to work together." *Id*. She concluded by stating that "[p]erhaps it may be necessary for me to look into this matter in order to understand what is really going on." *Id*.

Second, sometime in July 2017, someone at CCRD decided that one of the cashiers working in the Markham location (which Robinson supervised) should be transferred to another office. *See* Am. Cplt., at ¶ 29 (Dckt. No. 7). Robinson alleges that there was some kind of "misunderstanding" involving the transfer that led to a "breakdown in the working relationship" between him and Tyson. *Id*. Again, the complaint is short on details. The complaint does not allege that the "misunderstanding" was attributable to his disability.

Third, in mid-September 2017, Tyson contacted Robinson about an error that his office had made while recording a deed submitted through the online system. *Id*. at ¶ 30. Allegedly, during that conversation, Tyson told Robinson that "she was over E-recordings [sic] and she is

delegating all problems to be checked by Mr. Robinson because it's Mr. Robinson's responsibility." *See id*. at ¶ 48.

That statement prompted Robinson to reach out to his union representative, Yvette Pierce Williams. *Id*. at ¶ 30. The union representative allegedly told Robinson that Tyson couldn't force him to deal with e-recording issues because that task wasn't in his job description. *Id*. Robinson then reached out to a different union representative, Jamica Davis, who filed a grievance on his behalf, naming Tyson. *Id*. at ¶ 31; Exhibits to Am. Cplt., at 41 (Dckt. No. 9).

To resolve the issue, a conference call was scheduled for October 3, 2017, including Robinson, Tyson, Robinson's union representative (Davis), and a representative from Human Resources (Yolanda McDonald). *See* Am. Cplt., at ¶ 31 (Dckt. No. 7).

Before the call, Tyson sent two documents to the group. First, she sent a short letter explaining what she believed Robinson's job responsibilities were and how she had worked to accommodate him. *See* Exhibits to Am. Cplt., at 21–22 (Dckt. No. 9). Second, she shared an email from one of Robinson's co-workers complaining about the numerous mistakes he made. *Id*. at 23–24.

The complaint gives almost no details about what happened on that call. However, the complaint does allege that the Human Resources representative, Yolanda McDonald, asked him to send her his medical records "for the purpose of helping him." *See* Am. Cplt., at ¶ 34 (Dckt. No. 7).

On October 6, 2017, three days after the conference call, Robinson emailed his "medical records" to McDonald in Human Resources. *Id*. at ¶ 38. Two months later, "on or before December 3, 2017," he sent McDonald a copy of the report authored by his neuropsychologist dated 2013 (the same report he had sent to Human Resources in "2015 or 2016"). *Id*. at ¶ 34.

Once again, the complaint leaves the reader hanging. The complaint does not reveal what happened next. It is unclear whether McDonald ever responded to either message. And it is unknown whether CCRD promised or made any additional accommodations.

### Incident #5: Robinson Sends a Second Report from his Neuropsychologist to Human Resources (2018)

Meanwhile, in the fall of 2017, sometime around the conference call, someone at CCRD decided that the job description for Satellite Supervisor (Robinson's role) needed to be re-written. *Id.* at ¶ 36; Exhibits to Am. Cplt., at 6–8 (Dckt. No. 9). Robinson participated in a number of calls regarding what those changes might look like. In January 2018, he signed an updated job description. *See* Am. Cplt., at ¶ 36 (Dckt. No. 7). Signing that new job description caused Robinson so much stress that he developed a "hemorrhage" in his left eye. *Id.* at ¶ 38.

After he signed that job description, Robinson began sending his medical information and otherwise reaching out to Human Resources with increasing frequency. On February 14, 2018, he emailed McDonald a copy of a new report from his neuropsychologist, Dr. Mordini, dated September 2017. *Id.* at ¶ 39.

That report summarized Robinson's experience with the lack of support for his disabilities at work. Robinson believed that "his supervisor [Tyson] tends to minimize his disability and he is asked to perform tasks which are highly dependent on his vulnerabilities," that he "contacted his union for assistance in the matter," and that "he is hoping for increased accommodations at his job." *See* Exhibits to Am. Cplt., at 53 (Dckt. No. 9). In that report, Dr. Mordini once again recommended (as he did in the 2013 report) that "[i]n terms of his job duties, Mr. Robinson may benefit from job modifications including being given increased time to complete tasks which involve significant writing, reading and spelling (e.g. writing reports, sending emails, etc.) as well as organization and planning." *Id.* at 59; *cf. id.* at 18.

10

On March 21, 2018, Robinson "sent a memo" to his union representative, Tondalya Thomas. *See* Am. Cplt., at ¶ 41 (Dckt. No. 7). Robinson does not reveal the contents of that memo. *Id*. In response, Thomas apparently filed a grievance on his behalf. *Id*. Again, Robinson does not reveal the contents of that grievance. *Id*.

On April 16, 2018, he sent another email to Yolanda McDonald (again, in Human Resources) with the same September 2017 report. *Id*. at ¶ 40. On June 12, 2018, he called McDonald to see if she had received any of his emails. *Id*. at ¶ 42. The complaint does not reveal the outcome of that call.

### Incident #6: Robinson Requests to Be Excused from Evaluating Cashiers (2018)

In the summer of 2018, CCRD asked Robinson to generate written evaluations, for the first time, of the employees he supervised. *Id*. at ¶ 44. In August 2018, he attended training about how to do the evaluations. *Id*.

At some point Robinson may have requested an exemption. On September 13, 2018, McDonald and her supervisor, Pat Fallon, spoke with Robinson. They told him that he needed to evaluate his cashiers, but as always, his supervisor Linda Tyson would assist him with any tasks he found too difficult. *Id*. at ¶ 48; Exhibits to Am. Cplt., at 46 (Dckt. No. 9).

The complaint concedes that Tyson "did help on this occasion." *See* Am. Cplt., at ¶ 48 (Dckt. No. 7). But the complaint does not squarely allege whether Tyson failed to help him at any other time during this period. Instead, the complaint stretches back to 2017, alleging that Tyson "previously" failed to help him. *Id*.

Putting the allegations together, Tyson failed to help him enough in 2017 (as explained in Incident #4). But Tyson did help him on "this occasion" (meaning Incident #6) in mid-2018. It is unclear whether Tyson failed to help him on other occasions in 2018.

11

**Incident #7: Robinson Sends a Third Report from his Neuropsychologist to Human Resources**

On September 14, 2018, the day after the meeting with McDonald and Fallon, Robinson reached out to Yolanda McDonald again, and emailed a new report from Dr. Mordini (his neuropsychologist) dated September 13, 2018. *Id*. at ¶ 47. In this 2018 report, Dr. Mordini included a number of statements that Robinson had made about his job. The report explained that Robinson was not receiving the accommodations that he needed for his disability.

According to that report, Robinson told Dr. Mordini that he "can't function," and that "he feels like his recommended job accommodations are not being followed/implemented." *See* Exhibits to Am. Cplt., at 61 (Dckt. No. 9). Robinson also told Dr. Mordini that "based on a new policy (and job description) he is required to fill out more extensive employee evaluations ('I even write full sentences') and perform other duties which have become quite stressful for him." *Id*. Robinson also reported that his "supervisor," presumably Tyson, was speaking to him in a "patronizing" manner. *Id*. Like the previous two reports, this report also stated that "the following recommendations continue to be warranted . . . [i]n terms of his job duties, Mr. Robinson would benefit from job modifications/accommodations including being given increased time to complete tasks which involve significant writing, reading, and spelling (e.g. writing reports, sending emails, etc.) as well as organization and planning." *See* Exhibits to Am. Cplt., at 66 (Dckt. No. 9).

Later that day, McDonald responded by email and offered to talk things over. "I want to discuss this issue with you. When you get a chance, can you call me. [sic]" *See* Am. Cplt., at ¶ 47 (Dckt. No. 7). The complaint does not allege what happened next. Maybe they "discuss[ed] this issue," or maybe they didn't. The complaint doesn't say, one way or the other.

In September and October, 2018, Robinson completed the evaluations of the employees he supervised. *Id.* at ¶ 45 (Dckt. No. 7). In the Charge of Discrimination he filed with the EEOC, he states that Tyson did provide him with "some assistance in the evaluations of 2 employees." *See* Exhibits to Am. Cplt., at 3 (Dckt. No. 9).

### Robinson Retires and Files Suit

Robinson originally planned to retire in 2020. *See* Am. Cplt., at ¶ 50 (Dckt. No. 7). But at some point, he decided to retire early, and did so on November 30, 2018. *Id.* In the weeks leading up to his retirement, he continued to reach out to Human Resources and send them his medical records. On November 14, 2018, Robinson sent an email to another member of the Human Resources, Alexis Serio, with the 2018 Report from Dr. Mordini. *Id.* at ¶ 49. On November 20, 2018, he emailed Serio another copy of the same report. *Id.* at ¶ 54.

Finally, on November 30, 2018, Robinson retired. *Id.* at ¶ 50. He had an exit interview with Serio, but neither his medical conditions nor his accommodations came up. *Id.* at ¶ 53. Robinson emailed and called Serio on December 10 and 11, respectively. *Id.* at ¶ 55. Serio responded by asking: "What do you want from me! I don't have time for this." *Id.*

That same day, December 11, 2018, Robinson filed his Charge of Discrimination with the EEOC. *See* Exhibits to Am. Cplt., at 2 (Dckt. No. 9). On January 3, 2020, he received a right to sue letter from the EEOC. *Id.* at 10. On March 30, 2020, Robinson filed this suit.

### Discussion

Defendants move to dismiss Robinson's claims under Rule 12(b)(6) on two grounds. First, they argue that the statute of limitations bars the claim to the extent that it relies on any conduct before February 14, 2018 (that is, 300 days before submitting the complaint to the EEOC). *See* Defs.' Mtn. to Dismiss Pl.'s First Am. Cplt., at 7–8 (Dckt. No. 15); Defs.' Reply in

Support of Their Mtn. to Dismiss Pl.'s First Am. Cplt., at 1–5 (Dckt. No. 24). Second, they argue that none of Robinson's remaining allegations support a plausible claim that CCRD discriminated against him. *See* Defs.' Mtn. to Dismiss Pl.'s First Am. Cplt., at 8–12 (Dckt. No. 15); Defs.' Reply in Support of Their Mtn. to Dismiss Pl.'s First Am. Cplt., at 5–7 (Dckt. No. 24).

The Court concludes that the statute of limitations bars Robinson from bringing claims about three of the seven incidents he describes in his complaint. Taken together, the remaining allegations state a claim for discrimination under the ADA.

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

When evaluating a motion to dismiss, the court begins by "taking note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Then, turning to the complaint itself, it "accept[s] the well-pleaded facts in the complaint as true," but ignores "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 129 S. Ct. at 1951).

When a defendant moves to dismiss a claim based on the statute of limitations, a court then asks whether there is "a conceivable set of facts, consistent with the complaint, that would

defeat a statute-of-limitations defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). If there is, then the complaint survives, and "questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id*. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). However, the Seventh Circuit recognizes "that a party may plead itself out of court by pleading facts that establish an impenetrable defense to its claims," and that "[i]f the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (cleaned up).

When a defendant moves to dismiss based on the notion that a plaintiff has failed to state a "plausible" claim for relief, the court asks whether the plaintiff's well-pleaded factual allegations, taken together, allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. That is, the plaintiff's allegations must tell "a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). If they don't, the complaint must be dismissed. *Iqbal*, 556 U.S. at 678.

## I.    Statute of Limitations

The complaint includes allegations about Robinson's experience in the workplace since 2003. Defendants argue that the claim is time barred to the extent that it rests on any conduct that took place before February 14, 2018 (again, 300 days before he filed the EEOC charge). In

15

response, Robinson argues that the conduct involved a continuing violation, which tolled the statute of limitations.

The Court concludes that three of the incidents are time barred because there is no "conceivable set of facts, consistent with the complaint," that allows for the inference that they accrued after February 14, 2018 or that they were tolled under the continuing violation doctrine. *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). However, the Court concludes that the remaining conduct can state a timely ADA claim because it's possible that they accrued after February 14, 2018.

A plaintiff must satisfy two deadlines to bring a timely ADA claim. First, in Illinois, an employee may sue under the ADA "only if he files a charge of discrimination with the EEOC within 300 days of the alleged 'unlawful employment practice.'" *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004) (citation omitted); 42 U.S.C. § 2000e–5(e)(1). Second, if the EEOC decides not to pursue the case and issues the plaintiff a "Notice of Right to Sue," the plaintiff must bring a case within 90 days. *See* 42 U.S.C. § 2000e–5(f)(1).

The second hurdle is not a problem here. Robinson filed suit 87 days after the EEOC issued a right-to-sue letter. *See* Exhibits to Am. Cplt., at 10 (Dckt. No. 9) (right to sue letter issued January 3, 2020); Cplt. (Dckt. No. 1) (original complaint filed March 30, 2020). The only issue is whether the conduct that took place more than 300 days before Robinson filed a charge with the EEOC can give rise to a timely claim.

### A.    Unlawful Employment Practices

When a plaintiff alleges that an employer engaged in multiple acts of discrimination, each discrete act is ordinarily treated as its own "unlawful employment practice," with its own 300-day clock. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002) ("Each

discrete discriminatory act starts a new clock for filing charges alleging that act."); *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 334 (7th Cir. 2004) ("Employees have a maximum of 300 days to file a charge of employment discrimination. That time runs from each discrete discriminatory event."). Each discrete act gets its own timeclock.

There are two wrinkles. First, a party may not extend the time period by requesting reconsideration of a time-barred claim. That is, when a plaintiff requests a particular accommodation, and the employer denies it, the clock starts ticking. A plaintiff cannot refresh the timeclock by making the same request twice and getting a second denial. *See Delaware State Coll. v. Ricks*, 449 U.S. 250, 261 n.15 (1980) ("Mere requests to reconsider . . . cannot extend the limitations periods applicable to the civil rights laws."). A request for reconsideration does not restart the clock.

Second, courts are split on whether a second denial gets its own timeclock. That is, imagine that a plaintiff requests an accommodation, the employer denies it, and then the employee makes a *new* request for the same accommodation that the employer denies yet again. Courts disagree whether the second denial can give rise to a timely claim if the first denial is time barred. The Seventh Circuit has not addressed the issue, and courts around the country are divided. *See, e.g., Floyd v. Lee*, 968 F. Supp. 2d 308, 324 (D.D.C. 2013) ("Courts have divided on the question of whether a new limitations clock begins running each time that a request for accommodations is made anew and denied again."); *see, e.g., Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 133–34 (1st Cir. 2009) (finding that an employee's claim was timely when he testified that he "continually made the same two requests" each week for two years, so long as one of those requests occurred within the statutory period); *Stewart v. D.C.*, 2006 WL 626921, at *6 (D.D.C. 2006) (holding that a plaintiff who requested an accommodation outside of the

limitations period and then, after her medical condition worsened, repeated the request, was barred by the statute of limitations even though her suit would have been timely based upon the second request); *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1249–50 (D.C. Cir. 2009) ("A plaintiff cannot extend the limitations period by reiterating an identical request [for a reasonable accommodation] that was previously denied. . . . [But a] claim based on the denial of a new request, made in light of changed circumstances, would not be time-barred.") (citation omitted).

As discussed above, Robinson seems to allege seven incidents: (1) CCRD's accommodation of his vision issues with his computer (*i.e.,* having a technician look at his screen in 2003 or 2004); (2) CCRD's original accommodation of his dyslexia (*i.e.,* having Tyson help Robinson with reading, writing, and technology-related tasks sometime between 2013 and 2014); (3) CCRD's receipt in 2015 or 2016 of a report from Dr. Mordini that recommended accommodations; (4) CCRD's deteriorating accommodation of his dyslexia in 2017, when Robinson and Tyson had a falling out; (5) CCRD's receipt in 2018 of another report from Dr. Mordini that recommended accommodations; (6) CCRD's help in evaluating cashiers in 2018; and (7) CCRD's receipt in 2018 of another report from Dr. Mordini that recommended accommodations.

For now, the Court concludes that all seven incidents get their own statutory clock. The record is undeveloped, and the allegations of the complaint are cloudy, leaving too many gaps and too many unanswered questions. It is possible that the facts will shed new light on whether Robinson was requesting reconsideration of a time-barred failure to accommodate.

For example, Robinson's submissions of the three reports authored by Dr. Mordini could be construed as three requests for the same accommodation, or an initial request and two requests

to reconsider. After all, in all three reports, Dr. Mordini recommended that CCRD adopt largely the same set of accommodations. *See, e.g.*, Am. Cplt., at ¶ 70 ("Dr. Mordiniti's [sic] report of September 13, 2018 (Exhibit 13) is consistent with his of September 28, 2017 in almost all regards and specifically with respect to his recommended job modifications.").

However, at this point, "there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense," namely, context that reveals that Robinson was requesting different accommodations with each submission. *Sidney Hillman Health Ctr.*, 782 F.3d at 928. Therefore, these particular "questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.*

## B. Accrual and Tolling

When deciding at the motion to dismiss stage whether a claim is timely, courts consider accrual and tolling. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990); *Cancer Found*, 559 F.3d at 674. The question is when the clock started to tick, and whether the clock was paused.

First, the Court asks whether any set of facts consistent with the complaint permits the reasonable inference that the claim accrued within the statutory period. *See Cada*, 920 F.2d at 450. Here, Robinson filed his Charge of Discrimination with the EEOC on December 11, 2018, so the claim is timely to the extent that it relies on conduct that took place on or after February 14, 2018 (*i.e.,* 300 days before he filed the charge). *See* Exhibits to Am. Cplt., at 2 (Dckt. No. 9). Second, if the claim accrued outside the statutory period, the Court asks if any set of facts consistent with the complaint permits the reasonable inference that the statute of limitations has been tolled (*i.e.,* "paused" for a sufficiently long period of time). *Cada*, 920 F.2d at 450.

### 1.     Accrual

The first question is when a claim accrues.  A claim accrues when (1) the defendant has

taken the action that injures the plaintiff *and* (2) the plaintiff discovers the injury.  *Id.* ("[Accrual]

is not the date on which the wrong that injures the plaintiff occurs, but the date – often the same,

but sometimes later – on which the plaintiff discovers that he has been injured."); *Sharp v.

United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001).  Here, Robinson's claim accrued when

(1) CCRD took the particular discriminatory action, *and* (2) Robinson discovered that he had

suffered an injury.

### Incident #1:  CCRD Learns About Robinson's Vision Issues and Makes an Initial Accommodation (2003 or 2004)

Robinson alleges that CCRD learned about his vision issues sometime in "early 2003 or

2004," and they accommodated him "at this time" by sending someone from tech support to look

at his screen.  *See* Am. Cplt., at ¶ 12 (Dckt. No. 7).  Any claim regarding this conduct accrued

long before February 14, 2018.

The complaint alleges that someone from tech support came to look at his computer

screen in 2003 or 2004 with the "intention" to improve his work set-up.  The complaint is

unclear about what happened next.

Maybe Robinson's theory is that he needed a better computer screen, but never received

one.  If so, that claim is time barred.  Maybe Robinson thought for a little while that he was

going to get a new computer screen, but ultimately didn't get it.  *See, e.g.*, *Sutton v. Potter*, 2004

WL 603477, at *6 (N.D. Ill. 2004) (finding that it might not always be clear when "failure to

accommodate ceased to constitute the normal and expected administrative delay or red-tape

associated with the process of reasonably accommodating, and started characterizing disability

discrimination instead").  But given the passage of time – more than a decade – it would not

matter. Robinson knew long before 2018 that he did not receive a new computer screen in 2003 or 2004.

The ADA claim is dismissed to the extent that it relies on the incident involving the computer screen in 2003 or 2004.

### Incident #2: CCRD Learns About Robinson's Dyslexia, Makes an Initial Accommodation (2013 to 2014)

Next, Robinson alleges that he told his supervisor Linda Tyson that he had a learning disability sometime in 2014, and that at a later point, CCRD accommodated his disability by having Tyson assist him with all tasks involving reading, writing, and technology. *See* Am. Cplt., at ¶ 23 (Dckt. No. 7). The Court concludes that any claims about this initial accommodation in that time period are time barred.

True, it's not clear exactly when CCRD took an action that injured Robinson. In fact, for this particular incident, it is not even clear if CCRD injured him at all. As discussed above, Tyson might have started helping Robinson as early as 2013. *Id.* at ¶ 71. Maybe the inference is that Robinson did not receive all the help that he needed.

There is no question that CCRD made the initial accommodation long before February 14, 2018, and that Robinson knew about it at the time. Therefore, any allegations about the initial accommodation in 2013 and 2014 are time barred.

### Incident #3: Robinson Sends a 2013 Report from His Neuropsychologist to Human Resources (2015 or 2016)

Robinson alleges that he sent Human Resources a copy of the 2013 Mordini report sometime in "2015 or 2016." *Id.* at ¶ 16. That report included several suggested accommodations. But this allegation is a bit of an island. The complaint alleges that he sent the report in 2015 or 2016, but Robinson does not allege what happened next.

21

Perhaps Robinson is alleging that he shared a report from his doctor in 2015 or 2016, and that the doctor recommended accommodations, but CCRD did not implement them. If so, then once again, it is difficult to pinpoint the exact date when this claim accrued. Robinson doesn't allege that CCRD ever told him that they decided not to implement the suggested accommodations, so it's difficult to know exactly when he should have inferred a refusal.

Even so, even if one reads the complaint in the light most favorable to Robinson, this part of the complaint is time barred. It is not plausible to infer that Robinson was still waiting with uncertainty in February 2018, wondering if CCRD would adopt accommodations recommended in 2015 or 2016. If he asked for accommodations in 2015 or 2016, he undoubtedly knew that he wasn't receiving them by 2018.

The ADA claim is dismissed to the extent that it rests on any alleged failure by CCRD to make accommodations based on the 2013 Mordini report in 2015 or 2016.

### Incident # 4:  Robinson's Relationship with Tyson Begins to Sour and the Quality of the Accommodation Deteriorates (2017)

The next incident is much closer to the line. The conduct stretches up to a few months before the statute of limitations deadline.

Robinson alleges that the quality of the accommodations dropped in 2017. That is, CCRD made the initial decision to accommodate him by having Tyson assist him with tasks involving reading and writing. And sometime later, he didn't get what he needed. Specifically, he alleges that sometime around the summer of 2017, Tyson became less available to help him with tasks, and started to become frustrated with him. *See id.* at ¶¶ 71, 72.

For now, the Court concludes that this incident is not time barred. CCRD took the action that injured Robinson – reducing the amount of help that he received from Tyson – beginning in the summer of 2017. One would think that Robinson knew about the lack of adequate help at the

22

time.  It seems unlikely that Robinson discovered after February 14, 2018 that he wasn't getting help in the summer and fall of 2017.

But at the motion to dismiss stage, it is a relatively high bar to conclude that a complaint does not pass muster under the statute of limitations.  The statute of limitations, after all, is an affirmative defense.  *See Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004).  If there is a "conceivable set of facts, consistent with the complaint, that would defeat a statute of limitations defense," the claim survives.  *See Sidney Hillman Health Ctr.*, 782 F.3d at 928.

The question is not when Robinson was injured.  The question is when Robinson *discovered* that he was injured.  *Cada*, 920 F.2d at 450.  Here, it is conceivable that Robinson did not discover his injury right away, for two reasons.

First, the complaint suggests that the decline in the caliber of accommodations was gradual.  *See id*. at ¶¶ 28–30.  It would be one thing if the accommodations came to a screeching halt.  If that were the case, Robinson would have known about it.  But here, the complaint paints a picture of a gradual, slow-rolling decline in accommodations.  It is the difference between a balloon that pops, and a balloon that loses a little air over time.

Second, and more importantly, Robinson participated in a process to resolve the issue. He filed a grievance, and participated in a conference call with his boss, Human Resources, and the union.  *See* Am. Cplt., at ¶¶ 31–32.  Robinson had some reason to think that things were on the mend.  During the call, Human Resources "asked for Plaintiff's medical reports ostensibl[y] for the purpose of helping him."  *Id*. at ¶ 34.  A request for medical records is a positive sign, suggesting that CCRD was considering the issue more closely.  Robinson responded by sending the Mordini report and the report from his eye doctor "on or before December 3, 2017."  *Id*.

The story, once again, gets hazy at that point. It is unclear what Human Resources did with the information. It is unknown whether CCRD gave Robinson any indication about what, if anything, they were going to do. Maybe Robinson had reason to hold out hope that better accommodations were on the way, or maybe not.

At the motion to dismiss stage, the question is whether any "conceivable set of facts," consistent with the complaint, could give rise to a timely claim. *Sidney Hillman Health Ctr.*, 782 F.3d at 928. Here, the facts about the 2017 dispute with CCRD are close to the boundary of the statute of limitations. It is at least "conceivable" that CCRD could have said something to Robinson that led him to believe that they would make changes. Maybe he did not realize until later that he was injured because CCRD gave him a false sense of hope.

This part of the claim might not survive when the record includes the full story. But for now, this part of the claim survives.

### Incidents # 5, #6, and #7: Robinson Sends 2017 and 2018 Reports from his Neuropsychologist to Human Resources, and Asks to Be Exempted from Evaluating Cashiers

Robinson's three remaining claims accrued on or after February 14, 2018. Robinson's two claims involving the 2017 and 2018 Mordini reports accrued, at the earliest, the day he sent CCRD the reports, and he sent both reports during the statutory period (February 14, 2018 and September 14, 2018, respectively). *See* Am. Cplt., at ¶¶ 39, 46 (Dckt. No. 7).

Robinson's final claim involves his allegation that he requested that CCRD exempt him from reviewing cashiers. That claim accrued on September 13, 2018, when CCRD informed him that he would not be exempted, but that, as usual, Tyson would help him with the reading, writing and technology-based elements. *Id.* at ¶ 48. Again, that's well within the statutory period.

24

In sum, at this juncture, only three of the incidents clearly accrued before February 14, 2018: Incident #1 (about the computer monitor in 2003 to 2004), Incident #2 (about the original accommodation of his dyslexia 2013 or 2014), and Incident #3 (about sending the Mordini report to CCRD in 2015 or 2016). Any claim based on those incidents is time barred.

### 2.    Tolling

Robinson argues that even if the first three incidents accrued before February 14, 2018, they are timely because the statute of limitations was tolled under the "continuing violations doctrine." *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 3–4 (Dckt. No. 21).

Before diving in, there is a threshold question whether the continuing violation doctrine applies to failure to accommodate claims at all. Precedent in this Circuit "is not entirely clear" on the issue. *See Rouse v. Chicago Transit Auth.*, 2016 WL 5233591, at *9 (N.D. Ill. 2016) (Dow, J.).

In *Tinner*, the Seventh Circuit laid out the "three theories under which a plaintiff may establish a continuing violation," and thus receive the benefit of tolling. *See Tinner v. United Insurance Company of America*, 308 F.3d 697, 707 (7th Cir. 2002). The first situation applies when "an employer makes employment decisions over time that make it difficult for the employee to determine the actual date of discrimination." *Id.* The second situation takes place when the employee's claim "involves an express discriminatory policy of the employer." *Id.* The third situation applies when "discrete acts of discrimination are part of an ongoing pattern and at least one of the discrete acts occurred within the relevant limitations period." *Id.*

But in a more recent case, the Seventh Circuit stated that a failure to accommodate is "a discrete act—not an ongoing omission—and therefore the continuing violation doctrine does not apply." *See Teague v. Northwestern Memorial Hospital*, 492 F. App'x. 680, 684 (7th Cir. 2012)

(citing *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130–31 (1st Cir. 2009)) (holding that a firm's decision not to provide an employee with additional resources was "a discrete discriminatory act" thus the continuing violation doctrine did not apply); *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007) (holding that failing to provide certain tools for a long period of time was a "discrete act of discrimination," not an ongoing policy); *Proctor v. UPS*, 502 F.3d 1200, 1210 (10th Cir. 2007)). That language in *Teague* seems to squarely hold that a failure to accommodate cannot be a continuing violation.

Districts courts have recognized the apparent tension between *Tinner* and *Teague*, including whether a failure to accommodate could fit within *Tinner*'s other two theories of a continuing violation. *See, e.g.*, *Rouse*, 2016 WL 5233591, at *11 ("While the unpublished *Teague* opinion suggests that this theory may no longer be viable where the alleged discrimination is the denial of a requested accommodation, *Teague* does not discuss or overrule *Tinner*."); *Platt v. Chicago Transit Authority*, 2019 WL 5393995, at *4 (N.D. Ill. 2019) ("Although *Teague* is an unpublished opinion, the similarity of the facts in Teague's case convince the Court to follow the Seventh Circuit's reasoning. The Court finds that, *in this case*, the continuing violation doctrine does not apply.") (emphasis added).

The Court does need to wade deeply into the issue of whether *Tinner* can provide a lifeline for an untimely failure to accommodate claim, because the result is the same either way. Robinson's claim does not fit within the continuing violation doctrine, even if it theoretically applied.

Robinson argues that the first three incidents fit within the first theory of the continuing violation doctrine: where "an employer makes employment decisions over time that make it difficult for the employee to determine the actual date of discrimination." *Tinner*, 308 F.3d at

26

707.  Robinson does not argue that the incidents fit within the second or third theories for a continuing violation.  *Id.*

The inquiry under theory one is identical to the inquiry under prong two of the accrual analysis.  In both cases, courts ask when the plaintiff should have known that he was suffering from discrimination.

A good example is *Sutton v. Potter*, 2004 WL 603477 (N.D. Ill. 2004).  There, the plaintiff argued that her disability discrimination claim was not time barred – even though she had waited more than nine years to bring suit – because the limitations period was tolled under the first theory of a continuing violation (that is, an employer who makes decisions over time).  *Id.* at *6.  Specifically, she argued that she had requested an accommodation nine years earlier, and the employer had never told her whether they planned to grant it.  *Id.* at *2.

The court held that the relevant question was at what point "a reasonable person should have understood [her employer's] inaction as a clear signal that it had no intention of reasonably accommodating [plaintiff]."  *Id.* at *6.  The court acknowledged that there was "'no straightforward answer' to the question of how long a reasonable person would wait" before filing suit.  *Id.* (quoting *Cox*, 2003 WL 21691044, at *7).  The court ultimately determined that, while plaintiff "properly establishe[d] a continuing violation," waiting nine years to bring suit was "obviously unreasonable."  *Id.*  Plaintiff was not sitting in suspense for nine years, wondering what the employer would do.

The same conclusion applies here.  The first incident involved problems with a computer monitor in 2003 or 2004.  The second incident involved an initial accommodation for his dyslexia in 2013 or 2014.  The third incident involved sending his doctor's report to Human Resources in 2015 or 2016.  It is not clear from the complaint whether Robinson is alleging that

27

CCRD dropped the ball and engaged in actionable conduct in those instances. But even if he is pursuing that theory, the claim is time barred. He wasn't waiting around in 2018, wondering whether CCRD would respond to issues raised from 2003 to 2016. If CCRD took actions against him based on those incidents, Robinson knew it before 2018.

In sum, the Court concludes that the claims about the first three incidents as defined above (involving the computer screen, the initial accommodation in 2013 or 2014, and the response in 2015 and 2016 to the Mordini report) accrued before February 14, 2018. The Court also concludes that the statute of limitations was not tolled under the continuing violation doctrine. The remainder of Robinson's allegations are within the statutory period, and can form the basis of his ADA claim.

## II.    Plausibility

Next, Defendants argue that the remainder of Robinson's ADA claim must be dismissed under Rule 12(b)(6) because he has not stated a plausible claim for disability discrimination.

There are two distinct categories of disability discrimination claims under the ADA: (1) failure to accommodate and (2) disparate treatment. *See Scheidler v. Indiana*, 914 F.3d 535, 540–41 (7th Cir. 2019). At this stage, Robinson is not required to have selected a theory of the case. *See Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) ("Although *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* require that a complaint in federal court allege facts sufficient to show that the case is plausible, they do not undermine the principle that plaintiffs in federal courts are not required to plead legal theories.") (citation omitted); *see also Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (concluding that a plaintiff claiming his employer discriminated against him under the ADA need not have specified legal theories in his complaint, thus he was permitted to claim a failure to

accommodate claim for the first time at summary judgment because he "pled a number of facts relevant to his failure-to-accommodate claim in his complaint"). His complaint survives so long as he has alleged facts that support a plausible claim under either theory.

The Court concludes that, at a minimum, Robinson has pled a plausible claim for failure to accommodate. Unlike the previous section, when the Court examined each of Robinson's allegations separately, here the Court looks at his remaining allegations together.

To state a claim for failure to accommodate under the ADA, Robinson must plead facts sufficient to support a reasonable inference that "(1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably." *Scheidler*, 914 F.3d at 541; *see also* 42 U.S.C. § 12112(b)(5)(A).

Defendants argue that Robinson has failed to plead facts sufficient to support a reasonable inference that he meets prong three: that CCRD failed to provide Plaintiff with a reasonable accommodation. *See* Defs.' Mtn. to Dismiss Pl.'s First Am. Cplt., at 1 (Dckt. No. 15) ("Plaintiff pleads that his employer accommodated his disability.")

Under the ADA, an accommodation is "reasonable" if it "enable[s] an individual with a disability who is qualified to perform the essential functions of that position" to perform them. *See* 29 C.F.R. § 1630.2; *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014).

An otherwise reasonable accommodation does not become "unreasonable" simply because it is not the accommodation the employee would have preferred. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) ("It is well-established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer."); *Jay v. Internet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir.

29

2000) ("It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests.").

Similarly, an employer is not required to work with the employee to determine what accommodation would be reasonable. While "the ADA does envision a flexible, interactive process by which the employer and employee determine the appropriate reasonable accommodation," that process isn't "an end in itself." *Rehling*, 207 F.3d at 1015. Instead, "it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought." *Id*. (internal quotation marks and citation omitted). Therefore, a plaintiff can't simply allege that their employer failed to engage in an interactive process. A plaintiff must allege that the "result of the inadequate interactive process was the failure of the [employer] . . . to provide the qualified individual a reasonable accommodation." *Id*. at 1016; *see also Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

Robinson alleges that CCRD did accommodate him in certain ways. As discussed above, the primary accommodation involved Tyson assisting Robinson with tasks involving reading and writing. *See* Am. Cplt., at ¶ 71 (Dckt. No. 7).

Robinson alleges, albeit indirectly (at best), that the accommodation was unreasonable because it did not allow him to perform certain "essential" tasks. He offers evidence that he was unable to read or respond to emails. For example, Robinson alleges that in the summer of 2017, Tyson emailed him after a customer's document was recorded incorrectly, and stated that she was concerned that Robinson was unable to read his computer screen or respond to emails appropriately. *See* Exhibits to Am. Cplt., at 70 (Dckt. No. 9).

He also offers evidence that he was unable to assist customers or the employees he supervised with recording deeds online. For example, another email about the same incident from one of his coworkers states that Robinson was unable to review e-recording requests on his own, and "this cause [sic] great concern." *Id*. at 25. And he offers evidence that he was unable to do various other aspects of his job without making mistakes. For example, an email sent by one of Robinson's co-workers in 2013 states that "I don't believe Andre gets up in the morning and says he is going into work and make [sic] as many mistakes as he can BUT that is what is happening; [sic] a lot. Andre causes more problems for us than you know, you all don't see the documents I see, you don't see the mistakes he makes as far as accounting goes." *Id*. at 23.

Most importantly, Robinson alleges that the caliber of the accommodations deteriorated over time, and that he needed more help. For example, Robinson repeatedly sent Human Resources the three reports authored by Dr. Mordini which stated that Robinson needed additional accommodations. *See* Am. Cplt., at ¶¶ 16, 39, 46 (Dckt. No. 7). The report explained how CCRD was not providing Robinson with the accommodations that he needed to do his job. He also specifically asked to be exempted from certain tasks, such as completing cashier evaluations. *Id*. at ¶ 48.

It is a question for a later day what parts of Robinson's job were essential, and whether he was able to perform essential tasks with accommodations. For now, Robinson's allegations are sufficient to survive a motion to dismiss.

## Conclusion

For the reasons stated above, the Court grants Defendants' motion to dismiss (Dckt. No. 15) in part, and denies it in part.

31

Date:    March 26, 2021

_____

Steven C. Seeger
United States District Judge